WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Inga K. McCord,

                    Plaintiff,

v.

Carolyn W. Colvin,

                    Defendant.

No. CV-14-02411-TUC-DCB (EJM)

**REPORT AND RECOMMENDATION**

Plaintiff Inga K. McCord ("McCord") brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner"). McCord raises two issues on appeal: 1) whether the Administrative Law Judge ("ALJ") properly evaluated the opinions of treating psychiatrist Dr. Bupp, and 2) whether substantial evidence supports the ALJ's credibility finding. (Doc. 17 at 1).

Before the Court are McCord's Opening Brief, Defendant's Response, and McCord's Reply. (Docs. 17, 18, 19). Based on the pleadings and the administrative record submitted to the Court, the Magistrate Judge recommends that the District Court, after its independent review, remand this matter for payment of benefits.

## I.     Procedural History

McCord filed an application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") on June 10, 2009. (Administrative Record ["AR"] 254). McCord alleged disability beginning September 15, 2008 (AR 254) based on

mycotoxicosis[1] and depression (AR 286). McCord's application was denied upon initial review (AR 102, 134) and on reconsideration (AR 103, 138). A hearing was held on July 18, 2011 (AR 64), after which ALJ Lauren Mathon found, at Step Four, that McCord was not disabled because she was capable of performing her past relevant work as a senior programmer and as a program analyst. (AR 121).

On November 1, 2012 the Appeals Council granted McCord's request to review the ALJ's decision. (AR 127–29). The Appeals Council vacated the ALJ's decision and remanded the case back to the ALJ to consider Dr. Bupp's residual functional capacity ("RFC") assessment and to evaluate new and material evidence submitted by McCord. (AR 128). The Appeals Council directed the ALJ to: update the treatment record, further evaluate McCord's subjective complaints, further evaluate McCord's mental impairments, give further consideration to McCord's maximum RFC, and, if warranted, obtain supplemental evidence from a vocational expert ("VE"). (AR 128–29).

A second hearing was held on July 31, 2013 (AR 46), after which ALJ Lauren Mathon again found, at Step Four, that McCord was not disabled because she was capable of performing her past relevant work as a senior programmer and as a program analyst (AR 23).

## II.   Factual History

McCord was born on February 15, 1950, making her 58 at the alleged onset date of her disability. (AR 254). McCord completed a bachelor's degree in sociology (AR 77), and has most recently worked as a senior computer scientist and a senior programmer III (AR 271).

### A.  Treating Physicians

#### 1.  Dr. Gray

McCord began treatment with Dr. Michael Gray in 2009 for evaluation and treatment of alleged mold exposure.

On March 31, 2009 Dr. Gray saw McCord for her initial appointment. She

---

[1] Mold poisoning

reported that after her father died in January 2006 she started to get sick every few weeks and in June her health really fell apart. (AR 369). She had a hostile environment at work and felt like stress was causing her illness so she took some time off, but when she went back to work she started to get sick again every 10 days or so. In February or March 2007 the air in her house was tested for mold; results were 2200 particles of Aspergillus in the living room and 1870 in the bedroom. McCord then removed all the carpeting and put down hard floors. She continued to get sick (AR 369–70), and took a leave of absence from work for 6 months but was laid off after 5 months. She started a new job but continued to get sick a lot and took a lot of time off. (AR 370). She had to resign because by Thursday or Friday she would be so exhausted and brain dead that she was not very productive. After she resigned the illness did not stop, and she described feeling like every cell in her body was full of lactic acid and exhausted. She could not lift a one gallon watering can to water her plants.

Dr. Gray noted that Aspergillus and Penicillium "are capable of producing toxins that are extremely problematic and that can account for a very wide array of systemic illnesses." (AR 372). He also stated that in his experience with 750 mold exposed patients, less than 10% are suffering from allergies. He explained that mold toxins can be stored in the body for a very long time, and that McCord would need additional testing to see if she still had toxins in her body. Dr. Gray further stated that 24% of the population has a genetic pattern that makes them at risk for not being able to clear toxins from their system on their own, and they can be "at risk for long-term chronic postexposure effect." Dr. Gray explained that to further assess McCord he would order tests such as comprehensive metabolic panels, arthritis profiles, thyroid profile, urine, blood counts, stool, bacterial cultures, parasite checks, fungal cultures, genetic screens, pulmonary function testing, and neurologic testing. (AR 374). Dr. Gray ordered a number of lab tests and asked McCord to schedule neuro testing, and noted that at the neuro testing they would "check on the genetic markers and the C4a complement split product and if they are elevated, we will go ahead and get the balance of the biotoxin pathway immune and

neuroendocrine testing done." (AR 377).

Dr. Gray saw McCord for a follow-up on April 20, 2009 after an amoeba was found in her lab results. (AR 365). He noted her active problems were: 1) GI parasites; 2) biotoxin pathway susceptibility; 3) gastroesophageal reflux disease ("GERD"); and 4) arthritis. (AR 365). Findings on exam were normal (AR 365–66). Dr. Gray noted that laboratory results showed that McCord is mycotoxin pathway mold susceptible and that she has an increased C4a complement split product. (AR 367). He recommended additional biotoxin pathway testing, noted he was not going to initiate treatment until the lab results were back, and stated he would call McCord with treatment information for the amoebas.

On May 26, 2009 Dr. Gray saw McCord for a follow-up appointment and added suspected mycotoxicosis to her list of active problems. (AR 360). McCord reported that her health interferes with her ability to do housework, chores, and other activities of daily living. Dr. Gray noted McCord experienced significant improvement in her GI status and was taking the medications prescribed for the amoebic organisms found in her stool. Dr. Gray detailed her responses to the Davidoff Inflammatory Symptom Frequency Profile, "an instrument that discriminates organ-system based inflammatory-related symptoms from somatoform-related symptoms,"[2] and noted that McCord "experiences pain on an

---

[2] McCord reported the following symptoms:

Daily and almost daily basis: lightheadedness and dizziness, dizziness when standing up, shakiness relieved by eating, sweet cravings, unusual thirst, nasal symptoms with discharge and stuffiness, reduced heat tolerance, need to pass urine with increased frequency, insomnia, and difficulty and discomfort with swallowing.

Several times a week: headaches, low energy and fatigue, throat discomfort, coughing, muscle discomfort and spasm, joint discomfort, rapid pulse, bloating and gas.

Several times a month: numbness, tingling, weakness, shaking, confusion, spaciness, inability to concentrate, memory problems, slurred words, difficulty with word finding, coordination difficulties, poor appetite, itchy watery eyes and nose, sinus discomfort, weak voice with hoarseness, reduced cold tolerance, swelling of glands, bruising without cause, reduced bladder control, itchy rash and hives, flushing of her skin, frequent jerking during sleep, unwanted falling asleep during the daytime, reflux of stomach acid, and abdominal discomfort with pressure, pain, and cramps.

Once a month or less: ringing in her ears, changes in hearing, pain and burning in

almost daily basis at a relatively mild level and it effects [sic] her left hip." (AR 361). Findings on examination were normal. (AR 362). Dr. Gray noted that labs were still pending, and that McCord had a "markedly elevated C4a complement split" on April 1, 2009 but that it came down in recent lab testing and he expected it would continue to do so with the treatment protocol. The plan was to implement the mycotoxicosis treatment protocol and the Ziem protocol, and see McCord back in 6 weeks.

McCord saw Dr. Gray's physician assistant, Sean Dorado, on May 29, 2009. (AR 354). McCord reported skin sensitivity to soaps, detergents, or chemicals, swollen glands, frequent or severe headaches, dizziness, vertigo, or fainting spells, chronic sore throat, asthma, racing heart, severe muscle pain or cramps, swollen joints, arthritis, or severe joint pain, excessive thirst or urination, intolerance to heat and cold, and difficulty sleeping. (AR 354–54). McCord denied weakness or excessive fatigue, and frequent depression. *Id*. Dorado observed that McCord's affect was appropriate, her memory was intact, and her thought processing and content was normal. (AR 357). He assessed: 1) biotoxin pathway susceptibility; 2) headache, not otherwise specified; 3) asthma, unspecified; 4) restless leg syndrome; 5) insomnia; 6) GERD; 7) knee pain; 8) hand pain; and 9) arthralgias (joint paint). (AR 357).

On August 18, 2009 Dr. Gray saw McCord for a follow-up. (AR 515). He noted her chronic fatigue continued to be an issue, that she was significantly impaired in her ability to do household chores or work full-time, that she was not experiencing any significant pain, and that her reactions to environmental triggers seemed to be more delayed and shorter in duration. Dr. Gray assessed: 1) mycotoxicosis; 2) arthritis; 3) GERD; 4) biotoxin pathway susceptibility; and 5) GI parasites/resolved. (AR 516). He noted that the labs drawn on April 20, 2009 showed "no significant abnormalities other than a mildly elevated PAI-1"[3] and that her residential mold plates showed accelerating or amplifying counts in the foyer, kitchen, bedrooms, bathrooms, and laundry room. (AR

---

her genital area, ankle swelling, palpitations, wheezing and chest tightness. (AR 360–61).

[3] Associated with some increased tendencies for clot formation

516–17).

On November 17, 2009 McCord saw Dr. Gray and stated she could not exercise 2 days in a row without having significant fallout, and the same thing happens if she cleans her house 2 days in a row. (AR 512). She is unable to maintain a regular 40 hour work week without having significant increased sickness, and Dr. Gray noted her absences were consistent with her chronic fatigue immune dysfunction syndrome. McCord stated she had joint pain in her hands, knees, and hips on an almost daily basis, and that is was not too severe and lasted 2–4 hours. Dr. Gray assessed: 1) fatigue; 2) restless leg syndrome; 3) insomnia; and 4) asthma, unspecified. (AR 514).

On January 19, 2010 Dr. Gray saw McCord and noted that she continued to be significantly impaired and had hired a housekeeper so she could get some exercise and not be fatigued all the time. (AR 509). Dr. Gray assessed toxic effect of nonmedicinal substance, and noted that she McCord needed to return to the lab because they did not complete all of the tests. (AR 511).

McCord saw Dr. Gray on May 11, 2010 and reported that she had industrial hygiene assessments done on her home and that she had significant mold amplification in several areas. (AR 505). Dr. Gray recommended that she leave her residence until it was totally free of mold. He noted she was "progressively more and more symptomatic and severely impaired with regard to her ability to engage in gainful employment, carry household chores and other needed activities of daily living in fact she has ceased to work and has obtained housekeeping services because she cannot keep up with it herself." Dr. Gray noted that her labs performed on March 25, 2010 "revealed a dramatic increase in her C4a complement split," and alpha-melanocyte stimulating hormone, arginine, and urine specific gravity were all low. (AR 507). He noted that McCord had problems remembering or following instructions, carrying out household chores, writing or typing for more than an hour, and difficulty with clear thinking while reading or doing simple arithmetic, and stated that "maintaining a regular work schedule will not be possible." (AR 508). Dr. Gray assessed: 1) biotoxin pathway susceptibility; 2) GERD; 3)

arthritis unspecified; 4) headache; 5) asthma, unspecified; 6) restless leg syndrome; 7) insomnia; 8) knee pain; 9) hand pain; 10) joint pain; 11) fatigue; 12) toxic effect of nonmedicinal substance;[4] and 13) frequent or recurrent urinary tract infections.

On August 10, 2010 Dr. Gray saw McCord and noted that she had tested positive for toxic mold and that the treatment protocol would consist of: 1) avoidance; 2) use of sequestering agents to eliminate toxins; and 3) use of antioxidants to mitigate against injury. (AR 501). He further noted that she was impaired at a fairly severe level due to her health status with regard to ability to engage in gainful employment, household chores, and other needed activities of daily living. McCord reported she had mild pain in her hand and knee lasting 5–8 hours per day, and that her main issue was exhaustion. (AR 502). Dr. Bupp noted she had no significant elevated labs and recommended she continue with the treatment protocol. (AR 503). His assessment was toxic effect of nonmedicinal substance.

On October 5, 2010 Dr. Gray saw McCord and noted she continued to remain severely impaired with regard to ability to do chores and other activities of daily living and maintain employment. (AR 498). McCord reported she experienced pain on an almost daily basis and that it was mild and could last for an hour or less. She generally felt like she was doing a little bit better and was improving on the treatment protocol. Dr. Gray assessed the same conditions as at the May 11, 2010 appointment.  (AR 500).

On January 4, 2011 McCord saw Dr. Gray and reported that she had hired a housekeeper because she could not do household chores because of her illness and fatigue. (AR 494). She could not hike because she did not have the energy or breath to maintain her stamina. Dr. Gray noted that her major areas of impairment were climbing stairs, household chores, and maintaining a regular work schedule, and that she was mildly impaired with regard to memory and following instructions. Dr. Gray further noted that McCord was "biotoxin pathway susceptible specifically on mold susceptibility

---

[4] Dr. Gray noted this "specifically refers to mycotoxicosis which has been confirmed on urine mycotoxin assays with trichothecenes being detectable in her urine."

based on her HLA class II low-resolution phenotype." (AR 495–96). The physical exam was normal except McCord had "slight hyperemia of the left lympanic membrane," and her pulmonary function test was normal. (AR 496). Dr. Gray recommended she try Ketoconazole nasal spray, and that if "she continues to maintain a boggy mucosal surface and polyps . . . I will refer her to ear, nose, and throat probably Dr. Robert Craig." He assessed the same conditions as at the May 11, 2010 appointment.

Dr. Gray saw McCord on February 28, 2011, and she indicated she was doing reasonably well. (AR 491). He noted that she had pain at a mild level for 5–8 hours on an almost daily basis, and was generally doing about the same as in the past. Dr. Gray assessed: 1) GERD; 2) arthritis NOS; 3) headache; 4) asthma, unspecified; 5) restless leg syndrome; 6) insomnia; 7) knee pain or problems; 8) hand pain; 9) joint pain; 10) fatigue and malaise; 11) toxic effect of nonmedicinal substance; and 12) frequent or recurrent urinary tract infection. (AR 492–93).

On March 29, 2011 McCord saw Dr. Gray and reported she continued to be significantly impaired in her ability to engage in gainful employment, household chores, and other activities of daily living. (AR 487). She tried to take a college course but had to drop out because of her illness. She had been sick every other week recently and had taken several courses of antibiotics, and stopped taking her sequestering agents. She experienced moderate pain almost daily for 5–8 hours, had been sick 4 times in the last 2 months, and felt as though she was doing a lot worse. (AR 488). Dr. Gray noted that her labs from January showed her C4a level was in the normal range, but because of the break in treatment he would need to repeat labs because "these indirect markers of toxic load may well have increased." (AR 489). Dr. Gray made the same assessment as at the February 28, 2011 appointment, with the addition of toxic reaction.

Dr. Gray saw McCord on May 24, 2011. (AR 483). He observed that she was alert and oriented and in no acute distress, and there was no evidence of respiratory distress. (AR 485). He noted the labs "revealed some interesting findings. Her serum osmolarity was 272 which was quite low even though her ADH was normal. In addition to that her

C4A complement split product is up from 400 to 3500 and her stool came back positive for a few psyllium." Dr. Gray assessed: 1) mycoses; 2) asthma; 3) sinusitis; 4) fibromyalgia/fibrosis; 5) GERD; 6) diverticulosis; 7) scoliosis, idiopathic; 8) restless leg syndrome; 9) hiatal hernia; 10) pacemaker, in place; 11) cough; 12) allergic rhinitis; 13) biotoxin pathway multi-susceptible; 14) pancreatitis; 15) back pain; 16) upper respiratory infection; and 17) postnasal drip. He ordered labs and prescribed Nizoral. (AR 486).

McCord saw Dr. Gray on July 19, 2011 and reported her house was lost in a fire. (AR 699). Findings on exam were normal, though Dr. Gray noted "she is obviously distressed from the aftermath of the fire and at the moment I would say is indeed in a posttraumatic stress state." (AR 702). Dr. Gray assessed: 1) toxic reaction; 2) GERD; 3) arthritis; 4) headache; 5) asthma; 6) restless legs syndrome; 7) insomnia; 8) knee pain; 9) hand pain; 10) joint pain; 11) fatigue and malaise; 12) toxic effect of nonmedicinal substance; and 13) urinary tract infections. (AR 702).

On October 4, 2011 Dr. Gray saw McCord for a 3-month follow-up. (AR 694). She reported that she was concerned about her immune system and seemed to pick up any illness that people around her had. Findings on exam were normal, and Dr. Gray made the same assessment as on July 19, 2011, with the addition of vitamin D deficiency. (AR 696–97). He ordered labs to check liver, kidneys, blood count, urine, and biotoxin pathway. (AR 697).

McCord saw Dr. Gray on January 10, 2012 for a follow-up. (AR 690). Findings on exam were normal, and he assessed: 1) systemic inflammatory response syndrome due to infection with organ dysfunction; 2) toxic reaction; 3) GERD; 4) arthritis; 5) headache; 6) asthma; 7) restless leg syndrome; 8) insomnia; 9) knee pain; 10) hand pain; 11) joint pain; 12) fatigue and malaise; 13) toxic effect of nonmedicinal substance; 14) urinary tract infections; 15) vitamin D deficiency; and 16) liver enzymes abnormal. (AR 692–693). Dr. Gray prescribed Nystatin for yeast in her stool sample and Reglan for her GERD because McCord had not been successful in taking her sequestering agents due to stomach irritation. (AR 693).

1    On April 17, 2012 McCord saw Dr. Gray and complained of intermittent extreme

2    fatigue that lasts a week at a time. (AR 686). She also reported exposure to mold from

3    books that she had in storage and brought back to her house. Findings on exam were

4    normal, and Dr. Gray made the same assessment as on the January 10, 2012 appointment.

5    (AR 688). He recommended biotoxin pathway lab tests and a stool fungal culture.

6    McCord saw Dr. Gray on May 15, 2012 for a complaint of upper respiratory

7    infections and GI upset. (AR 682). She reported that she got headaches when she was

8    dehydrated, and headaches associated with increased urinary urgency and frequency.

9    Findings on exam were normal, and Dr. Gray made the same assessment as at the January

10   10, 2012 appointment. (AR 684). He recommended she continue her treatment protocol

11   and return in 2 months for follow-up labs.

12   On July 24, 2012 Dr. Gray saw McCord and noted "[s]he is complying with her

13   treatment protocol." (AR 678). Findings on exam were normal, and Dr. Gray noted that

14   her labs from April showed elevated TGF-b1 and anti-diuretic hormone, "[b]oth of which

15   are biotoxin pathway related issues." (AR 679). Dr. Gray made the same assessment as

16   on the January 10, 2012 appointment. (AR 679–80). He noted that McCord had nighttime

17   asthma symptoms and symptoms during the day 1–2 times per month, and that her

18   fatigue had become much less of a problem, requiring a 24 hour recovery period instead

19   of 72 like in the past. (AR 680).

20   McCord saw Dr. Gray on August 14, 2012 for a follow-up on labs. (AR 673).

21   Findings on exam were normal, and Dr. Gray made the same assessment as at the January

22   10, 2012 appointment. (AR 675).

23   On January 15, 2013 McCord saw Dr. Gray and reported she was frustrated by her

24   compromised health status and wanted to discuss the side effects of her anti-diuretic

25   hormones. (AR 669). Findings on exam were normal, and Dr. Gray noted that her labs

26   showed "a TGF-b1 in the 11,000 range and her anti diuretic hormone was less than 0.8,

27   which is considered below the level of detection." (AR 671). He also noted that McCord

28   was still suffering from systemic inflammatory response syndrome and that she had

deviated from her sequestering agent treatment after her house fire, but that she was beginning to get back on her treatment plan. Dr. Gray made the same assessment as at the January 10, 2012 appointment      .

McCord saw PA Sean Dorado on June 28, 2013 for evaluation for testosterone. (AR 666). She reported that she was doing well, and findings on exam were normal. (AR 666–68). He assessed abnormal blood chemistry (high testosterone) and menopause ovarian failure. (AR 668).

2.  Dr. Bupp

Dr. Bupp has been McCord's treating psychiatrist since January 1996. (AR 290). The earliest progress note in the record is from 2007, though a medication log dates back to March 20, 2001. (AR 352).

On August 20, 2007 Dr. Bupp documented a phone call with McCord, noting that her application for DIB was denied and she was going to appeal. (AR 351). In parentheses he wrote "and should."

Dr. Bupp saw McCord on October 11, 2007. She reported an increase in restless leg syndrome, and that taking the full dose of Clonazepam barely helped. (AR 351). He observed that she was alert and oriented, her mood was fair, and her affect was obsessive compulsive. Dr. Bupp assessed major depressive disorder, recurrent, in partial remission; restless leg syndrome, moderate/severe; and obsessive compulsive disorder, moderate.

On January 28, 2008 Dr. Bupp saw McCord and noted that her meds were fine but made her tired. (AR 351). She reported that she had a new job, and going back to work was physically challenging. She frequently used ½ tablet plus another ½ tablet of her sleeping medication for her restless leg syndrome. Dr. Bupp observed that McCord was alert and oriented, her mood was fair, and her affect was anxious. He assessed major depressive disorder, recurrent, in partial remission; restless leg syndrome, moderate; and obsessive compulsive disorder, mild. (AR 350).

On July 23, 2008 McCord reported a lot of health problems, stating she was sick all the time since starting her new job, had low blood pressure, and was fatigued. (AR

350). Dr. Bupp observed that she was alert and oriented, her mood was decreased, and her affect was bland and labored. He assessed major depressive disorder, recurrent, in partial remission versus depression secondary to general medical concerns; restless leg syndrome, moderate; and obsessive compulsive disorder, mild.

A note from July 29, 2008 states that McCord called and reported her medications were causing an allergic reaction and severe panic, and that she vomited after taking Clonazepam. (AR 350).

On October 2, 2008 McCord reported that her new primary care physician wondered whether she had untreated depression, and that she had to quit work due to recurrent medical illness. (AR 349). Dr. Bupp observed that McCord was alert and oriented, her mood was fair to ok, and her speech was present. He assessed major depressive disorder, recurrent, in partial remission; restless leg syndrome, moderate; and obsessive compulsive disorder.

Dr. Bupp saw McCord on January 7, 2009, and she reported some bouts of depression with the holidays, that hiking really helped, and that her restless leg syndrome was worse. (AR 349). He observed McCord was alert and oriented, her mood was ok, and her affect was obsessive compulsive. Dr. Bupp assessed major depressive disorder, recurrent, in partial remission; restless leg syndrome, severe; and obsessive compulsive disorder.

On April 30, 2009 Dr. Bupp observed that McCord was alert and oriented, her mood was ok, and her affect was anxious. (AR 348). Dr. Bupp noted that McCord had historically undertreated herself and recommended she use good doses of CMI and Clonazepam. Dr. Bupp also noted that McCord was continuing to fight mold and was sick all the time, and was seeing Dr. Gray for these issues.

Dr. Bupp saw McCord on September 23, 2009 and noted that she was alert and oriented, her mood was fair, affect was grounded, and memory decreased. (AR 481). McCord stated she was taking 2 CMI per day but felt she needed 3, and Dr. Bupp agreed. Dr. Bupp assessed major depressive disorder, recurrent, in partial remission; restless leg

syndrome, moderate; and obsessive compulsive disorder.

On January 27, 2010 McCord saw Dr. Bupp and reported her hair was thinning due to mold, and that she was doing better with 3 CMI per day. (AR 481). He noted she was alert and oriented, mood was ok, affect was slightly narrow, and memory was ok. Dr. Bupp assessed major depressive disorder, recurrent, in partial remission; restless leg syndrome, moderate; obsessive compulsive disorder; and mold.

McCord saw Dr. Bupp on May 12, 2010 and reported she was only "ok" and had a series of depressions. (AR 480). He observed that she was alert and oriented, mood only fair, affect was ok, and memory was intact. He assessed major depressive disorder, recurrent, in partial remission; restless leg syndrome, moderate; and mold titers increased.

McCord saw Dr. Bupp on September 8, 2010 and reported she felt better with lower mold titers and full doses of medication, and that the side effects were infrequent and manageable. (AR 478). Dr. Bupp noted McCord was alert and oriented, her affect was anxious, her mood was good, and her OCD symptoms persisted. He assessed that her depression was in partial remission, her OCD was stable and moderate, and that her chronic mold infection with severe fatigue was ongoing.

Dr. Bupp saw McCord on March 23, 2011 and she reported that she was sick a lot and that her immune system was struggling. (AR 477). He noted she was alert and oriented, mood was ok, affect was anxious, memory was intact, and "OC worry process—yes." Dr. Bupp assessed depression, in remission; OCD, ongoing battle; and immune/mold issues.

On September 14, 2011 McCord saw Dr. Bupp and reported a lot of stress because her house caught on fire. (AR 598). She stated her sleep was fair and anxiety and OCD were at moderate to severe levels. Dr. Bupp observed that McCord was alert and oriented, mood fair, affect anxious, and memory intact. He assessed major depressive disorder, recurrent, in partial remission, and OCD.

On February 8, 2012 Dr. Bupp saw McCord and noted moderate anxiety and OCD symptoms. (AR 596). McCord was alert and oriented, her mood was holding, affect

anxious, and memory intact. He assessed major depressive disorder, recurrent, in partial remission, and OCD, noting both were stable but with exacerbation related to McCord's recent squamous cell carcinoma diagnosis.

Dr. Bupp saw McCord on February 29, 2012. (AR 597). She reported a lot of stress with her house being rebuilt and noted Aspergillus had been reintroduced when she brought books back from storage, and stated even limited exposure made her sick and "I catch every damn bug in the universe." Dr. Bupp noted she was alert and oriented, plodding and logical, mood ok, affect weary, and memory intact. He assessed major depressive disorder, recurrent, in partial remission, and OCD, and noted she was stable.

Dr. Bupp saw McCord on February 6, 2013. (AR 595). She reported her restless leg syndrome was worse, that she was about the same overall, and had daily anxiety and OCD. She hikes, volunteers, and stays active. Dr. Bupp observed mood was good, affect was anxious, memory intact, and "OC process—yes." He noted McCord was stable and assessed major depressive disorder, recurrent, in partial remission, and OCD.

### 3. Sierra Vista Regional Health Center

McCord was treated at the Sierra Vista Regional Health Center beginning in 2008.

A bone density exam on September 22, 2008 showed osteopenia. (AR 468). McCord was recommended to take calcium and vitamin D supplements and do weight bearing exercise.

On September 30, 2008 McCord was seen for a follow-up appointment for her recent hospitalization and lab work. (AR 464). McCord requested short-term disability because she was too tired to work. Nurse practitioner Ellen Litner assessed fatigue, hypotension, and polyuria, but noted all of McCord's lab results were within normal limits. McCord "became very upset . . . and stated she was disappointed that we did not find a reason why she felt so bad." Litner also assessed depression, noting McCord appeared depressed and that depression could account for a lot of her symptoms, and encouraged McCord to follow-up with Dr. Bupp. (AR 465). Litner noted McCord was insisting on short-term medical disability because she had missed a lot of work, but that

"[a]t this point we do not have a medical reason to justify disability." Litner encouraged McCord to discuss disability with Dr. Bupp, and referred McCord to an endocrinologist, "as she is seeking an answer for why she feels so bad."

McCord saw Dr. Nusrum Iqbal on January 27, 2009 with a complaint of headache in the frontal head area, also affecting the back of neck and shoulder. (AR 462). She reported no energy, stress, and feeling tired. Dr. Iqbal noted a history of chronic allergic rhinitis. On exam, Dr. Iqbal found no evidence of sinus tenderness or nasal mucosa congestion, tenderness over both shoulders, and a tender point over right intrascapular muscles. He assessed headache, most likely cervicalgia due to cervical disc disease, and prescribed Valium for a muscle relaxant and Tylenol for pain. (AR 462–63). Dr. Iqbal also assessed chronic allergic rhinitis and recommended McCord continue using Singulair, Astelin, Clarinex, and Nasonex; cervicalgia and noted he would send McCord for an x-ray and neck exercises; and fatigue, chronic and multifactorial, and noted he would order labs. (AR 463).

On February 11, 2009 Dr. Iqbal saw McCord for a follow-up on cervicalgia. (AR 460). He noted she could not tolerate the Valium and it made her very sick. McCord reported her neck pain was slightly better but she was still having spasms and no relief with pain medicines. She also complained of allergies and fatigue. Dr. Iqbal noted her labs were normal, but that she did have a history of yeast and bite infection and she had probably developed chronic fatigue syndrome secondary to that. McCord denied anxiety, depression, headaches, and shortness of breath. Dr. Iqbal assessed: 1) cervicalgia, recommending Tylenol and physical therapy; 2) chronic sinusitis, McCord will follow up with infectious disease doctor, Dr. Adams; 3) chronic fatigue syndrome, most likely due to Epstein Barr virus, all labs are normal; 4) GERD, continue Nexium; 5) chronic allergic rhinitis, continue medications; 6) x-ray of c-spine ordered. (AR 461).

McCord saw Dr. Iqbal on July 14, 2009 for a complaint of dizziness and lightheadedness. (AR 457). She also reported a productive cough, headaches, pain in the back of her throat for a few months, and significant sinus drainage. On exam Dr. Iqbal

noted nasal mucosa significantly congested. He assessed: 1) dizziness, multiple reasons, and ordered lab work and a Holter monitor; 2) acute bronchitis, prescribed Avelox; 3) chronic allergic rhinitis, continue medications; 4) sore throat, most likely due to post nasal drip; 5) GERD, restart Prilosec. (AR 457–58).

On December 20, 2009 McCord saw Dr. Iqbal for a follow-up on a urinary tract infection. (AR 455). She reported slightly congested head, mild runny nose, spitting up phlegm, and no facial pain or headaches. Dr. Iqbal assessed 1) urinary tract infection, uncomplicated, discontinue Cipro, and 2) upper respiratory tract infection, continue Tylenol for pain, and take Claritin or Allegra.

Dr. Iqbal saw McCord on April 12, 2010 for an annual physical. (AR 453). She reported feeling tired most of the time, no anxiety or depression, stable allergies, pain in left hip, and low back pain. On exam Dr. Iqbal noted mild tenderness in the left hip area but no weakness in left lower extremity. (AR 454). He assessed chronic allergic rhinitis, chronic fatigue, GERD, history of restless leg syndrome, anxiety and depression, and chronic sinusitis. (AR 454). He recommended McCord continue her medications and ordered labs and x-rays of the left hip and lumbosacral spine to look for arthritis.

On April 29, 2010 McCord saw Dr. Iqbal for a follow-up for a urinary tract infection and reported fatigue. (AR 451). He assessed 1) urinary tract infection, resolved; 2) hyperlipidemia, continue with Coenzyme Q10, fish oil, and recheck lipids fasting; and 3) fatigue, lab tests ordered.

An x-ray of McCord's left hip on May 11, 2010 was negative for fracture and showed "possible left iliac horn or small sclerotic lesion in the left iliac crest." (AR 471). On the same date, findings for an x-ray of the spine were "T11 vertebral body demonstrates a mild anterior compression fracture deformity, age-indeterminate" and "the lumbar spine demonstrate mild spondylosis with no evidence of fracture or subluxation." (AR 476).

On September 16, 2010 McCord saw Dr. Iqbal for a complaint of sinus tenderness, facial swelling, mild shortness of breath, no energy, productive cough, feeling tired, and

mild headaches. (AR 449). She denied any complaint of anxiety or depression. Dr. Iqbal assessed: 1) acute sinusitis, continue with medications and add Avelox; 2) fatigue, labs ordered; 3) GERD, continue Protonix; 4) chronic allergic rhinitis; and 5) history of shortness of breath, possible bronchial asthma, continue Foradil inhaler and do pulmonary function testing.

McCord saw Dr. Iqbal on September 22, 2010 with a complaint of right shoulder pain, stating she could not sleep well because of the pain. (AR 448). She denied any sinus problems, dizziness, or lightheadedness. On exam, Dr. Iqbal found the right shoulder was tender. He assessed: 1) right shoulder pain, most likely degenerative joint disease, and ordered an x-ray and prescribed Voltaren; 2) chronic allergic rhinitis, stable with current medications; and 3) acute sinusitis, continue with antibiotics. An x-ray of McCord's right shoulder on September 22, 2010 was unremarkable. (AR 470).

On October 1, 2010 Dr. Iqbal saw McCord for a follow-up on right shoulder pain, noting the pain medicine worked and her shoulder was better after stopping activity. (AR 447). Her pain was a 2–3 out of 10. Dr. Iqbal assessed: 1) right shoulder pain, most likely bursitis, continue Voltaren as needed; 2) hypertension, better controlled; 3) GERD, stable with Protonix; and 4) chronic allergic rhinitis, doing well with no symptoms today.

McCord had an x-ray of her right shoulder on December 23, 2011. (AR 594). Results were normal.

On January 6, 2012 McCord had a MRI of her right shoulder. (AR 591). The impression was: "The rotator cuff demonstrates a small full thickness tear at the level of the supraspinatus tendon with a 5 mm tendon gap. Additionally, there is underlying supraspinatus and subscapularis tendinopathy . . . Long head of the biceps tendon demonstrates moderate tendinosis. Mild fluid is seen within the subdeltoid/subacromial bursa. Mild to moderate subacromial narrowing as above." (AR 591–92).

McCord had an x-ray of her sinuses on May 22, 2012. (AR 579). The finding was an unremarkable exam with no gross air-fluid levels or opacities within the sinuses.

On March 30, 2013 McCord was admitted to the Sierra Vista Regional Health

Center emergency department with a complaint of blood in her stool. (AR 567–70). She was transferred to UMC where she had an upper endoscopy and colonoscopy, MRA of the chest and abdomen, and CT of the abdomen, and was found to have colon cancer. (AR 615). McCord had a laprascopic right colectomy on April 12, 2013 (AR 612), and was discharged home on April 16, 2013 (AR 610). At a post-operative consult on May 6, 2013 McCord reported that she was eating well, having normal bowel movements, and no longer using pain medication. (AR 608).

4.   Physical Therapy

McCord had an initial evaluation for physical therapy ("PT") on February 7, 2012. (AR 586). She reported right shoulder pain and dysfunction, reduced mobility, pain, and weakness. The therapist noted McCord had severely limited activities, including shopping, driving, housework, and hiking. (AR 586, 589). Her shoulder impingement test was positive. (AR 590). He recommended 8 weeks of PT, with 1 to 2 sessions per week. (AR 587, 590).

A reevaluation report from May 4, 2012 notes that McCord reported an easier time with reaching and lifting activities, and was doing her home exercise program. (AR 582). The therapist observed that McCord had pain with certain movements and weakness in the shoulder and upper back. (AR 582). He noted that McCord was making steady progress toward her treatment goals (AR 584), and that her shoulder impingement test was positive (AR 585). He recommended that she continue PT for 4 more weeks. (AR 582).

A discharge summary from May 14, 2012 states that McCord was seen for 25 visits for shoulder pain and range of motion and strengthening. (AR 580). At discharge, McCord's pain with activities of daily living had decreased from severe to mild, and her pain with recreational activities had decreased from severe to moderate. The therapist noted she still had pain with reaching overhead to do her hair but it was mild. McCord was instructed to continue with her home exercise program and follow-up with her doctor if symptoms reoccurred.

1

     5.  Dr. Wagelie

2

     McCord saw Dr. Amy Wagelie-Steffen on May 23, 2013 for a complaint of

3

immune deficiency. (AR 600). McCord complained that she was always sickly, catches

4

viruses frequently, and suspected mold in her home was the cause. McCord denied joint

5

pain or stiffness, anxiety, and depression, and reported headaches. Findings on exam

6

were normal. (AR 601). Dr. Wagelie-Steffen's impression was: 1) vasomotor rhinitis, 2)

7

fatigue, and 3) recurrent viral upper respiratory infections, and she recommended lab

8

work and a throat culture.

9

    B.  Additional Medical Information

10

     On August 15, 2009 Dr. Bupp completed a Medical Assessment of the Patient's

11

Ability to Perform Work Related Activity form. (AR 405–06). Dr. Bupp rated McCord as

12

having a moderate[5] degree of impairment in the following areas: ability to relate to other

13

people, restriction of daily activities, and deterioration of personal habits. (AR 405). He

14

also rated McCord as having a moderately severe degree of constriction of interests.

15

Regarding McCord's ability to do activities in a routine work setting, Dr. Bupp opined

16

that McCord had moderate limitations in her ability to understand, carry out, and

17

remember instructions, respond appropriately to supervision, respond appropriately to co-

18

workers, and perform simple tasks. (AR 405–06). He opined McCord had moderately

19

severe[6] limitations in her ability to respond to customary work pressures, to perform

20

complex, varied, and repetitive tasks, and to complete a normal workday/workweek

21

without interruptions from psychologically based symptoms and to perform at a

22

consistent pace without an unreasonable number/length of rest periods. (AR 406). Dr.

23

Bupp noted that depression, OCD, and aspergillosis had a combined effect on McCord's

24

functional capacity, and that her limitations could be expected to last for 12 months or

25

longer.

26

     On October 12, 2009 Dr. Gray completed a Medical Assessment of Ability to do

27

28

     [5] Moderate: an impairment which affects but does not preclude ability to function

     [6] Moderately severe: an impairment which seriously affects ability to function

Work Related Physical Activities form. (AR 417–19). He listed McCord's diagnosed medical impairments as: unspecified complication of procedure, not elsewhere classified (998.9); pain in joint, site unspecified (719.40); pain in joint, lower leg (719.46); and other extrapyramidal diseases and abnormal movement disorders (333.99). (AR 417). Dr. Gray opined that McCord could occasionally lift and carry 20 pounds, frequently lift and carry less than 10 pounds, stand and/or walk less than 2 hours in an 8 hour work day, sit less than 6 hours and needed to stretch every hour, and must alternate sitting and standing. (AR 417). He stated McCord could occasionally balance, stoop, kneel, and crouch, never crawl, frequently climb, and use both hands to handle, manipulate, feel, and reach occasionally. (AR 418). Dr. Gray also opined McCord had environmental limitations to heights, moving machinery, temperature extremes, chemicals, dust, noise, and mold. (AR 419).

In a letter dated May 11, 2010 Dr. Gray noted that he was McCord's treating physician for problems associated with excessive fatigue, asthma, mycotoxicosis, recurrent and frequent urinary tract infections, insomnia, restless legs syndrome, arthritis, and headaches. (AR 446). He opined that she was "unable to engage in gainful employment as a result of the symptoms including excessive fatigue associated with her clinical condition." Dr. Gray further stated that

> Given the severity of her clinical condition, understanding that her condition does fluctuate at times but is also extremely unpredictable in terms of the onset of exacerbation of her symptoms, it is a reasonable medical certainty that Inga K McCord is unable to engage in gainful employment and should be considered permanently impaired and totally disabled.

*Id*.

Dr. Gray completed another Medical Assessment of Ability to do Work Related Physical Activities form on January 10, 2012. (AR 659). He listed McCord's diagnosed medical impairments as: systemic inflammatory response syndrome (995.92), toxic reaction (989.89), chronic fatigue and malaise (780.79), restless legs (333.94), arthritis (716.98), and asthma (493.90). Dr. Gray opined that McCord could occasionally lift and

carry 20 pounds, frequently lift and carry less than 10 pounds, stand and/or walk less than 2 hours in an 8 hour work day, sit for 6 hours, and must alternate sitting and standing every 30 minutes. He stated McCord could occasionally climb and balance, and never stoop, kneel, crouch, or crawl. (AR 660). She could use both hands to handle, manipulate, feel, and reach occasionally, except that she could feel frequently with the right hand. Dr. Gray also opined McCord had environmental limitations to heights, moving machinery, temperature extremes, chemicals, dust, noise, and bright lights. (AR 660–61).

Dr. Gray also completed a Pain RFC Questionnaire on January 10, 2012. (AR 662). He opined that McCord had moderately severe pain (pain seriously affects ability to function), and that the degree of pain could reasonably be expected to result from objective clinical or diagnostic findings. Dr. Gray stated changing weather, hormones, movement/overuse, stress, cold, heat, humidity, static position, and allergies all precipitated the pain, and that McCord's pain was frequently severe enough to interfere with her attention and concentration. Dr. Gray also opined that McCord frequently experienced deficiencies of concentration, persistence, or pace. (AR 662–63). On a Fatigue RFC Questionnaire, Dr. Gray reported that McCord suffered from moderately severe fatigue (seriously affecting ability to function), and that her fatigue frequently interfered with her attention and concentration. (AR 664). Dr. Gray stated that McCord experienced deficiencies of concentration, persistence, or pace often, and that she could not sustain work on a regular and continuing basis.

C.  State-Agency Physicians

Dr. Huntley Hoffman saw McCord for a psychiatric consultation on October 7, 2009. (AR 407). McCord stated that she had been seeing Dr. Bupp since 1996, and was hospitalized twice for depression. She felt her depression increased after 2007 when she lost her job, and felt frustrated because she was not able to work. Dr. Hoffman noted that she admitted to feelings of anxiety but denied what would appear to be any systematic excessive anticipatory apprehension. He also noted occasional panic symptoms and that she denied symptoms consistent with OCD. Dr. Hoffman noted McCord had experienced

significant current and historical stressors, and was currently dealing with mold poisoning. McCord reported she was taking 20 medications for treatment of mold poisoning, and that she had severe fatigue, low energy, and itinerant pain. (AR 408). Dr. Hoffman recorded her activities of daily living as follows: she is independent for all responsibilities in the house including shopping, she takes violin lessons and practices frequently, she enjoys frequent hikes in the mountains, volunteers once a week at a park, takes care of the dogs, drives and has a license, and recently hired a housekeeper. She described her social life as limited because of her husband's disability and reduced interest in being around people.

On examination, Dr. Hoffman noted that McCord enjoyed talking and answered his questions with in-depth details and history. (AR 408). She was alert, oriented x3, and in no apparent distress. (AR 409). She presented with a euthymic mood, her affect was congruent with mood and thought content, and she was unremarkable for stream and content of thought. Dr. Hoffman opined that her symptoms were consistent with a mood disorder, in partial remission. He assessed major depressive disorder, recurrent, in partial remission, and mold poisoning.

On October 9, 2009 Dr. Jerome Rothbaum saw McCord for a consultative examination. (AR 410). McCord's chief complaints were of mold poisoning and she described several years of upper respiratory infections and fatigue. Dr. Rothbaum noted McCord had been "extensively worked up in the past" but that the results were unremarkable. McCord stated she sleeps 9 to 10 hours, that she is very fatigued if she sleeps less, and that she attempts to hike and keep up her fitness but she is very fatigued afterwards. (AR 411). On examination, Dr. Rothbaum noted she was alert, oriented, cooperative with adequate recall, and in no acute distress. (AR 412). Dr. Rothbaum observed that McCord's nose had "somewhat pale boggy hypertrophy particularly on the right but no definite polyp formation," and that she had a "very slight end-expiratory wheeze heard with forced expiration." She was able to dress and undress normally, squat normally, and walk normally. Dr. Rothbaum's impression was: 1) atopic diathesis; 2)

history of exercise induced asthma; 3) history of Epstein Barr infection, remote; and 4) depression. (AR 413). He opined that these conditions would not impose limitations for 12 continuous months, noting "[t]he claimant does give a history of persistent fatigue and recurrent upper respiratory-like infections however these symptoms are entirely subjective. They are not subject to objective verification and therefore the assessment must be that there are no specific limitations." (AR 414).

Dr. James Green completed a Case Analysis on November 2, 2009. (AR 420). He opined that the somatic impairments were not severe, and noted that there were no severe physical limitations per the CE exam and that Dr. Gray's less than sedentary assessment was not supported by objective medical findings.

Dr. Jack Marks completed a Psychiatric Review Technique form on November 3, 2009. (AR 421). He noted McCord had major depressive disorder in partial remission (AR 424), and that her impairments were not severe (AR 421). Dr. Marks assessed a mild degree of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace, and noted McCord had no episodes of decompensation of extended duration. (AR 431). Dr. Marks noted McCord was in ongoing treatment and that she stated Klonopin and Anafranil were helpful, and that "[e]ven though there are constraints she is active in the community." (AR 433).

Dr. David Anderson testified at the hearing before the ALJ on July 18, 2011. Dr. Anderson is board certified in psychiatry and opined that McCord had a mood disorder but that it was difficult to ascertain how severe it was from Dr. Bupp's progress notes. (AR 74). He could not say what McCord's RFC would be "in the absence of significant and very descriptive notes" (AR 74), and could not indicate what the severity of McCord's disturbance was. (AR 75). Dr. Anderson also noted that he was not familiar with the field of mold exposure and did not know how widely accepted the neurophysiological and neuropsychological tests were that Dr. Gray used. (AR 73).

Dr. Harvey Alpern testified at the hearing before the ALJ on July 18, 2011. He

opined that biotoxin pathway susceptibility is not a diagnosis, and that the toxicology tests that Dr. Gray used were not accepted by the medical profession to monitor mold. (AR 80). Dr. Alpern noted that in the past McCord had amoeba in the gastrointestinal tract, that she has a history of fatigue but no diagnosis of chronic fatigue, that she has knee and joint pain but does not take any prescription pain medications, that she is being treated for GERD, and that she has a history of asthma but her pulmonary function test is normal. He opined that McCord's impairments did not meet or equal any listing, and that she should be restricted to light work with no concentrated exposure to noxious fumes, dust, and irritants. (AR 81). The restriction to light work is based on McCord's history of fatigue, asthma, knee and joint pain, and other pain. (AR 82). Dr. Alpern stated that he disagreed with Dr. Gray's assessment that McCord could do less than sedentary work because "he doesn't do any objective physical testing to show that she's not capable of doing more or less, and the restrictions seem to be based upon testing that is generally not accepted such as micro toxicology of her mold." (AR 81–82). Dr. Alpern further stated that there were no accepted tests for measuring symptoms from mold exposure, and that in his opinion, McCord's fatigue was due to depression. (AR 83).

D. Plaintiff's Testimony

On a Disability Report dated July 13, 2009 McCord reported that she could not work because of mycotoxicosis and depression, and that if she did normal activities for two days in a row, she was extremely exhausted for several days afterwards and had to go to bed. (AR 286). She stated that she had "severe depression because I cannot work, and I have to limit my activities to avoid being sick and exhausted constantly." She noted that "Last year when I was working, I would get so exhausted by Wednesday afternoon that I would be unable to think well enough to do my job." McCord stated that she was at her most recent job for 10 months and missed 160 sick hours, and that she was sick every 10 days to 2 weeks. (AR 287). She had to resign without a diagnosis because the doctors she went to could not find anything wrong with her. McCord reported that in her job as a senior computer scientist, she walked and stood for 0.5 hour each and sat for 7 hours,

1    handled and grasped big objects for 7 hours, wrote, typed, or handled small objects for 7

2    hours, and did not do any climbing, stooping, kneeling, crouching, crawling, reaching or

3    lifting and carrying. (AR 288). In her job as a senior programmer III, she walked for 1

4    hour, stood for 0.5 hour, sat for 6.5 hours, climbed for 0.5 hour, reached for 0.5 hour,

5    grasped big objects for 7 hours, wrote, typed, or handled small objects for 7 hours, and

6    never stooped, kneeled, crouched, crawled, or lifted. (AR 278). McCord stated that her

7    "illness is not work related, but it does significantly impact my ability to think and to

8    work more than a couple of days a week before I get sick from a communicable disease

9    or exhaustion from my mold toxins." (AR 283).

10          On a Function Report dated July 24, 2009 McCord reported that her daily

11   activities vary based on how she feels, and that when she is sick she has no energy to do

12   housework, walk, or prepare meals. (AR 296, 298). She stated that "I get sick every time

13   I resume 'normal' activities 3–4 days in a row," (AR 296), and she can only clean one or

14   two rooms a month because it leaves her exhausted for several days afterward (AR 298).

15   She takes care of her husband by preparing meals and cleaning because he is also sick,

16   but noted she needs help. (AR 297). She also takes care of their two dogs and two cats by

17   feeding them and taking them to the vet. McCord stated that before she got sick, she

18   could work full-time, do all household duties, and exercise 2–4 times a week. Her

19   depression affects her sleep and she had to increase two medications for sleep. When she

20   is well she goes outside daily, but when she is sick she does not go out for days because

21   she is too exhausted and depressed. (AR 299). When she feels well enough to go to the

22   store, she spends no more than ½ hour shopping for necessities. McCord stated her

23   hobbies are painting, violin lessons, hiking, and reading, but also wrote "no more hiking"

24   and "I can no longer hike." (AR 300). She stated she has "cut way back on everything"

25   and "stopped taking violin lessons for months" and painted less frequently. She keeps in

26   touch with others through email, phone calls, and some mall walks but cancels frequently

27   because of illness or exhaustion, and noted her social life was 25% of what it used to be.

28   (AR 300–01). McCord stated her illness affects her walking, memory, concentration, and

ability to complete tasks, and that when she is sick she cannot do anything that requires mental exercise. (AR 301).

On an undated Disability Report, McCord stated that her fatigue was worse and that she had been diagnosed with chronic fatigue, and that these changes occurred in 2009. (AR 310). She stated that since last completing a disability report, she "had to stop cleaning the house because I was severely fatigued for several days after doing it" and that she had "to limit any exercise or I am extremely fatigued for several days afterwards." (AR 313).

On a Function Report dated February 17, 2010 McCord stated that her day consists of getting up and having cereal and coffee, going back to bed, and eating an apple and cheese or soup for dinner. (AR 316). She reported that she did not take care of any other people or animals, and that she could not work, clean her house, cook, or exercise. (AR 317). She reported her sleep was poor "due to feeling very bad" and that because of her illness she stays in her pajamas, does not bathe regularly, and prepares easy food like cereal and soup because she is too fatigued to prepare a meal. (AR 317–18). She needs reminder lists for personal care and medications, and does not pay bills, count change, use a checkbook, or manage a savings account because she does not feel confident in her mental faculties. (AR 318–19). She does not do housework because she is too fatigued and hired a housekeeper. (AR 318). She does not go out because she has no energy to walk, does not go out alone because she is too fatigued and does not feel steady, and does not feel reliable enough to drive. (AR 319). McCord stated she has no hobbies except for watching a little tv, and that she has "no energy to do anything but exist." (AR 320). She no longer hikes, paints, or reads, does not spend time with others, and is too tired and depressed to have a social life. (AR 320–21). McCord reported that her illness affects her ability to lift, squat, bend, stand, reach, walk, kneel, talk, climb stairs, complete tasks, follow instructions, and get along with others, and that her memory, concentration, and understanding are impaired. (AR 321). She can walk for 50 feet and then rests for 20 minutes, can pay attention for 1–2 minutes, and does not finish

what she starts. McCord stated that she is "essentially too tired to do much other than sit or go to bed," (AR 321), and that she handles stress "very poorly," her hair fails out and she cannot sleep (AR 322).

On a Disability Report dated April 29, 2010 McCord reported that she had problems with some of her mold medications and that she was experiencing frequent bladder infections, and that these changes occurred in 2010. (AR 336). She stated that since last completing a disability report, she was very fatigued and did not do housework or other work at all. (AR 339).

McCord testified at her hearing before the ALJ on July 18, 2011. She stated that she tries to walk her dog on a regular basis for exercise, and that she drives to town twice a week for grocery shopping. (AR 78). She traveled to Idaho to visit her brother several times after his wife died. (AR 78, 86). McCord takes prescription medications for depression, anxiety, sleep, acid reflux, and asthma, plus a lot of vitamins and minerals, and Tylenol for restless legs and Advil for headaches. (AR 79). On examination by her attorney, McCord stated that she forgets things more frequently than she did in the past, and that she had a "lack of ability to concentrate much diminished." (AR 89). She reported that if she tried to work as a programmer for several hours a day, she "would run out of mental capabilities in about 50 percent the time that I did ten years ago." McCord stated that she took a lot of time off of work in 2007 because she was ill so frequently, and used up all of her sick and vacation time. If she tries to do housework for half a day, the next day she is mentally drained and feels incapable of balancing her checkbook, and her muscles ache badly. (AR 92–93). McCord testified that some days she can do the household finances, but she doesn't attempt to on days when she is very fatigued. (AR 94). She was laid off of her job because she could not work a 40-hour week, and then she got a new job but could not work a full week because: "By about Wednesday I lost my ability to solve problems anymore. By Thursday I would be there, but I would really, really wish I could crawl under my desk and lie down so I lost all productivity at that point. Friday was typically just a nothing day." (AR 94–95).

McCord testified again at the hearing before the ALJ on July 31, 2013. She stated that "When I am not sick I try to exercise an adequate amount" and that she takes her dog out for a short walk when she feels good. (AR 51). She used to hike but has not hiked for 6 or 7 years. McCord volunteers at a nursing home 2 to 3 times a month for 1 hour (AR 52), and volunteers at a bookstore for 3 to 4 shifts a month but has to call in sick about 50 percent of the time (AR 53, 56). She cares for her husband by helping procure his medications, and preparing meals when she feels good. (AR 54). They both take care of the finances, but McCord hired someone to do their taxes because "it's gotten to be too much for me." (AR 55). She spends about 50 percent of her time sick, which leads to depression, and she takes a lot of naps. (AR 55, 56). When sick, she does not read because it is difficult for her to concentrate, she feels really bad, stares out the window a lot, and is very fatigued. (AR 56). McCord naps once or twice a day for 2 to 3 hours. (AR 56). When not sick, she reads, paints, plays violin, and keeps the house tidy. (AR 55). Her walking depends on the state of her illness, and in a good week she might walk twice. (AR 55–56). Her illnesses typically last for 7 to 10 days, so she is sick 14 to 20 days a month, and for maybe 10 days in a good month. (AR 57).

E.  Lay Testimony

McCord's husband completed a Function Report dated February 20, 2010. He described his wife's daily activities as sleeping for 11–12 hours, having coffee and breakfast, resting most of the afternoon, eating dinner and going to bed. (AR 324). He stated she "cares for me as best she can" and does laundry and fixes dinner sometime. (AR 325). She also gives their pets food and water, and he does it when she cannot. Before her illness, Mr. McCord stated his wife was extremely active and hiked, worked, and took care of her dying parents. He noted she had no problems with personal care but needed reminders to bathe or wash her hair and take her medications. (AR 325–26). He reported that her sleep was very poor and that sometimes she has to take sleeping pills in the middle of the night. (AR 325). Mr. McCord stated his wife prepares her own meals, mainly cereal, sandwiches, and frozen dinners, and noted that they "very seldom have a

dinner that doesn't come out of a can or box." (AR 326).  His wife can do laundry, but they have a maid for most cleaning because McCord does not have the physical energy to do it and is exhausted afterwards. (AR 327). Mr. McCord stated his wife goes out most days at least once, and that she can drive and go out alone, and that she is able to pay bills, count change, use a checkbook, and handle a savings account. (AR 327). He reported his wife's hobbies were painting, listening to music, watching tv, and reading, and that she does at least one of these things every day unless she feels exceptionally bad. (AR 328). She spends very little time with other people, other than to keep in touch, and her "former friends have shunned her due to not being able to do the things she used to before the illness." (AR 328–29). His wife's conditions affect her ability to lift, walk, climb stairs, remember things, concentrate, understand, follow instructions, and get along with others. (AR 329). Mr. McCord stated that his wife's extreme fatigue affects all of her physical activities and that she had nervous system damage from her illness that affects her ability to concentrate and remember. She cannot walk far, must rest after walking, can only pay attention for a few minutes, does not finish what she starts, and follows written and spoken instructions poorly. Mr. McCord reported that his wife handles stress poorly and that her hair was falling out in clumps and she cries often. (AR 330). He summarized his wife's condition as like having flu symptoms every day with extreme fatigue, aches and pains, and headaches, and noted that she used to be extremely energetic but did almost no activities now. (AR 331).

F.  Vocational Evidence

Kathleen McAlpine testified as a VE at the July 18, 2011 hearing before the ALJ. She stated that McCord's past work as a senior programmer and a program analyst was sedentary and skilled. (AR 97). Based on the hypothetical presented by the ALJ, McAlpine testified that a person with McCord's restrictions could perform both the senior programmer and program analyst positions. (AR 98).

McCord's attorney presented a hypothetical including limitations of occasional lifting and carrying of 20 pounds, frequently lifting less than 10 pounds, standing and

walking for less than 2 hours in an 8 hour workday, and sitting for less than 6 hours. McAlpine testified that these limitations would be less than sedentary work. McCord's attorney presented a second hypothetical where the individual would have moderately severe limitations in the ability to respond to customary work pressures, to perform complex tasks, to perform repetitive tasks and varied tasks, to complete a normal workday and workweek without interruptions from psychological symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 99). The ALJ testified that such a person would be precluded from McCord's past relevant work and all other work.

Robin Scher testified as a VE at the July 31, 2013 hearing before the ALJ and stated that she agreed with the assessment of VE McAlpine. (AR 58–59). Based on the hypothetical presented by the ALJ, Scher testified that a person with McCord's physical limitations could perform both the senior programmer and program analyst positions. (AR 60). The ALJ presented a second hypothetical including mild mental limitations in understanding and remembering complex instructions, carrying out complex instructions, ability to make judgments on complex word-related decisions, ability to interact with the public, supervisors, and coworkers, and ability to respond appropriately to usual work situations and changes in a routine work setting. Scher testified that a person with these mental limitations could perform the work that McCord did. The ALJ presented a third hypothetical with moderate degree of impairment in ability to relate to other people, restriction of daily activities, deterioration in personal habits, ability to understand, carry out, and remember instructions, respond appropriately to coworkers and supervision, and perform simple tasks, and with moderately severe degree of impairment in constriction of interests, ability to respond to customary work pressures, ability to perform complex, repetitive and varied tasks, ability to complete a normal workday or workweek without interruptions from psychologically based symptoms, and ability to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 60–61). Scher testified that a person with these limitations could not do any job. (AR 61).

On questioning by McCord's attorney, Scher testified that missing work 10 days a month would exceed any employer's tolerance for absenteeism. (AR 61–62). McCord's attorney asked if Scher would agree "that there are no work environments that are completely devoid of dust and irritants," and Scher responded that "a home has the same amount of dust as anywhere else. The work environment gets cleaned usually every evening, but they're not devoid." (AR 62).

G. ALJ's Findings

1. August 23, 2011 Opinion

The ALJ found that McCord had the following severe impairments: history of asthma, history of minor joint pain, and history of fatigue. (AR 118). The ALJ noted that these "are more than slight abnormalities and have more than a minimal effect on the claimant's ability to do basic physical or mental work activities." The ALJ also found that McCord's mental impairments of depression and mood disorder were not severe and did not cause more than a minimal limitation, and that McCord's mold poisoning was not a medically determinable impairment.

The ALJ also considered the Paragraph B criteria set out in the social security disability regulations for evaluating mental disorders.[7] For the first functional area, activities of daily living, the ALJ found McCord had mild limitations and noted limitations in this area seemed to be related to McCord's physical impairments. (AR 119). For the second functional area, social functioning, the ALJ found McCord had a mild limitation because she reported some relationship problems with family members. For the third functional area, concentration, persistence, or pace, the ALJ found McCord had a mild limitation because she described problems with memory and concentration but was able to list 20 medications and responded to questions during the mental examination

---

[7] The criteria are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) periods of decompensation. As to the first three of these, the court determines whether their severity is none, mild, moderate, marked, or extreme. As to the fourth criteria, it is the number of times these "periods of decompensation" occur. *See* 20 CFR 404.1520a(d)(1) and 20 CFR 404, Subpart P, App. 1, § 12.00

with great detail. Finally, for the fourth area, episodes of decompensation, the ALJ found that McCord had not experienced any episodes of decompensation for an extended duration.

The ALJ found McCord's testimony regarding her subjective complaints and alleged limitations was not fully credible due to discrepancies in her testimony and because the medical evidence did not support the severity of the alleged symptoms and limitations. (AR 120). The ALJ noted that while McCord alleged problems with memory, she could "recall with precision and speed almost all of her numerous medications," was able to recall dates, "and did not appear to be forgetful or unable to concentrate." The ALJ further noted that the medical evidence did not support McCord's alleged limitations due to asthma because she was treated with an inhaler, Dr. Rothbaum noted "very slight end-expiratory wheeze heard with forced expiration," and pulmonary function testing was normal. Regarding McCord's alleged knee pain, hand pain, and joint pain, the ALJ noted objective medical testing showed normal results, that Dr. Gray consistently diagnosed joint pain but did not treat it, and that McCord only took nonprescription pain medication. (AR 120–21). The ALJ also noted the lab results for McCord's fatigue were within normal limits when she was tested in September 2008, and that her doctor refused to put her on temporary disability because there was no medical basis to do so. (AR 121). Finally, the ALJ stated that while McCord went to a specialist for treatment of mold exposure, Dr. Alpern testified that this was not a medically determinable impairment.

The ALJ gave no weight to Dr. Gray's opinion that McCord could not work because his opinion "is not supported by tests that are recognized by medical professionals." (AR 121). The ALJ gave great weight to the opinion of medical expert Dr. Alpern, who testified that the tests performed by Dr. Gray were not objective and not accepted by the medical community.

The ALJ concluded McCord could perform a light range of work, with postural limitations of occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and avoiding concentrated exposure to dust, fumes, and irritants. (AR 119). At

Step Four of the SSI/DIB evaluation process, the ALJ found McCord was able to perform her past relevant work as a senior programmer and program analyst both as actually performed and generally performed. (AR 121). The ALJ therefore concluded McCord was not disabled. (AR 122).

### 2.  August 22, 2013 Opinion

The ALJ found that McCord had the following severe impairments: history of asthma, history of joint pain/arthritis, history of fatigue, and status post colectomy. (AR 20). The ALJ noted that these impairments caused more than minimal functional limitations and were therefore severe. The ALJ further found that McCord's mold poisoning was not a medically determinable impairment because Dr. Alpern testified that it was not an acceptable diagnosis in the medical profession and because Dr. Gray only treated McCord with vitamins and charcoal. (AR 20–21). The ALJ also found that McCord's mental impairments of depression and mood disorder were not severe and did not cause more than a minimal limitation in her ability to perform basic mental work activities, and that McCord only received "modest treatment" for depressed mood. (AR 21).

The ALJ also considered the Paragraph B criteria set out in the social security disability regulations for evaluating mental disorders. The ALJ found McCord had mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace, and had no episodes of decompensation of an extended duration. (AR 21).

The ALJ found that McCord's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible." (AR 23). The ALJ based this credibility finding on her observation that McCord received "modest treatment for gastrointestinal problems, right shoulder joint pain/stiffness, rhinitis, arthritis, asthma, restless legs, and fatigue." The ALJ also noted that McCord's treatment had generally been successful in controlling her symptoms. The ALJ further found that McCord's level of functioning was inconsistent with her alleged limitations because she was able to volunteer several times a month, take care of her husband and pets, keep the house tidy,

read, play the violin, paint, cook, and walk for exercise. The ALJ stated that "[i]t can thus be inferred that the claimant has maintained a somewhat normal level of daily activity and interaction" and that "the physical and mental requirements of these household tasks and social interactions are consistent with a significant degree of overall functioning."

The ALJ gave less weight to Dr. Bupp's opinion because "it is too restrictive and not supported by the objective evidence." (AR 21). The ALJ gave little weight to Dr. Gray's opinion because he assessed limitations more restrictive than those found in the hearing decision, and because Dr. Alpern testified that mold infection was not a medically determinable impairment and Dr. Gray did not use tests recognized by the medical profession. (AR 23).

The ALJ concluded McCord could perform the full range of light work, with postural limitations of occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and avoiding concentrated exposure to dust, fumes, and irritants. (AR 22). At Step Four of the SSI/DIB evaluation process, the ALJ found McCord was able to perform her past relevant work as a senior programmer and program analyst both as actually performed and generally performed. (AR 23). The ALJ therefore concluded McCord was not disabled. (AR 24).

## III.   Standard of Review

The Commissioner employs a five-step sequential process to evaluate SSI and DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460-462 (1983). To establish disability the claimant bears the burden of showing she (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) the claimant's RFC precludes her from performing her past work. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point

in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4).

In this case, McCord was denied at Step Four of the evaluation process. Step Four requires a determination of whether the claimant has sufficient RFC to perform past work.  20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as that which an individual can still do despite his limitations. 20 C.F.R. §§ 404.1545, 416.945. An RFC finding is based on the record as a whole, including all physical and mental limitations, whether severe or not, and all symptoms. Social Security Ruling ("SSR") 96-8p. If the ALJ concludes the claimant has the RFC to perform past work, the claim is denied. 20 C.F.R. §§ 404.1520(f), 416.920(f).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Valentine*, 574 F.3d at 690 (internal quotation marks and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (internal citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotations and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc.*

*Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (internal citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (*citing Shinseki v. Sanders*, 556 U.S. 396, 129 S.Ct. 1696, 1706 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion. *Id.* (internal quotation marks and citations omitted). Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." *Strauss v. Comm'r Soc. Sec.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

**IV.    Analysis**

McCord argues that the ALJ erroneously rejected Dr. Bupp's opinion and that this error was harmful because the VEs testified that the restrictions assessed by Dr. Bupp would preclude all work. McCord also argues that the ALJ failed to provide clear and convincing reasons for negatively assessing McCord's credibility, and failed to consider the lay witness testimony.

The Commissioner contends that the ALJ properly evaluated Dr. Bupp's opinion by according it "less weight" because McCord received only "modest treatment" by Dr. Bupp. The Commissioner also argues that substantial evidence supports the ALJ's negative credibility assessment because there were inconsistencies between McCord's

reported symptoms and her demonstrated functioning, and because the medical evidence did not support McCord's alleged limitations. The Commissioner further contends that any error by the ALJ in failing to comment on the lay witness testimony was harmless.

The undersigned finds that the ALJ erred in failing to provide legally sufficient reasons for rejecting Dr. Bupp's opinion and for negatively assessing McCord's credibility, and that the ALJ erred in failing to address the lay witness testimony. The undersigned further finds that these errors are harmful and that remand for an award of benefits is appropriate.

A. Treating Physician Opinions

McCord alleges that the ALJ erred by failing to properly evaluate the opinions of her treating psychiatrist, Dr. Bupp. McCord argues that because the ALJ erroneously rejected these opinions, substantial evidence does not support the ALJ's RFC assessment, the adverse credibility finding, or the Step Four determination. McCord further contends that these errors were harmful because the VEs testified that the limitations assessed by Dr. Bupp would preclude all work, thus necessitating a finding that McCord was disabled and requiring that this matter be remanded for an award of benefits. Alternatively, McCord contends that, at a minimum, Dr. Bupp's opinion demonstrates that she cannot perform her past relevant work and that this matter should be remanded for further proceedings to give additional consideration to Dr. Bupp's opinions.

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (*quoting Lester*, 81 F.3d at 830). "Courts afford the medical opinions of treating physicians superior weight because these physicians are in a better position to know plaintiffs as individuals, and

because the continuity of their treatment improves their ability to understand and assess an individual's medical concerns." *Potter v. Colvin*, 2015 WL 1966715, at *13 (N.D. Cal. Apr. 29, 2015). "While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Garrison*, 759 F.3d at 1012 (internal quotations and citations omitted). Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's activities of daily living. *Tommassetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). "An ALJ can satisfy the substantial evidence requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id*. However, "when evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Finally, if the ALJ determines that the plaintiff's subjective complaints are not credible, this is a sufficient reason for discounting a physician's opinion that is based on those subjective complaints. *Bray v. Comm'r Soc. Sec. Admin*., 554 F.3d 1219, 1228 (9th Cir. 2009).

In addition, if the ALJ does not give the treating physician's opinion controlling weight, then the ALJ must evaluate the opinion according to the requirements set out in 20 C.F.R. 404.1527(c). Thus, in determining what weight to afford Dr. Bupp's opinion, the ALJ was required to consider (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of Dr. Bupp's opinion; (3) the consistency of the opinion and the record as a whole; (4) whether Dr. Bupp is a specialist, and; (5) other factors that would support or contradict Dr. Bupp's opinion. *Id.*

Here, if the ALJ believed that Dr. Bupp's opinion was contradicted by the examining and consulting physician opinions, then the ALJ was required to give specific and legitimate reasons supported by substantial evidence for rejecting Dr. Bupp's opinion. The ALJ failed to meet this burden when she summarily rejected Dr. Bupp's opinion as "too restrictive and not supported by the objective evidence" and noted that McCord "received only modest treatment for depressed mood." (AR 21); *see Garrison*, 759 F.3d at 1012 ("The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."). Further, in noting that she accorded "less weight" to Dr. Bupp's opinion because it was too restrictive, the ALJ failed to address the factors set out in 20 C.F.R. 404.1527(c).

In addition, while the examining and consulting physician opinions somewhat contradict Dr. Bupp's opinion, the ALJ did not even mention these other doctors' opinions in her decision when she discounted Dr. Bupp's opinion. Moreover, these opinions are not entirely inconsistent with Dr. Bupp's opinion. For example, Dr. Hoffman examined McCord and found that her symptoms were consistent with a mood disorder. He assessed major depressive disorder, recurrent, in partial remission. (AR 407–09). This opinion is not inconsistent with Dr. Bupp's diagnosis of depression. Dr. Rothbaum completed a consultative examination and his impression was depression. He opined that McCord's impairments would not impose limitations for 12 continuous months because there was no objective verification of her persistent fatigue or recurrent upper respiratory

infections. (AR 410–14). Dr. Rothbaum's impression of depression was not inconsistent with Dr. Bupp's opinion, and Dr. Rothbaum's opinion that McCord's impairments would not impose limitations was based on her alleged physical impairments. Dr. Marks completed a psychiatric review form and assessed major depressive disorder, in partial remission. (AR 424). He found McCord had a mild degree of limitation (AR 431), and noted she reported her medications were helpful (AR 433). While Dr. Marks assessed only mild limitations as opposed to Dr. Bupp's assessment of moderate and moderately severe limitations, both doctors opined that McCord was depressed and had some resulting mental limitations. It is also important to note that Dr. Marks did not examine or treat McCord, but made his assessment based on a review of the record. Dr. Anderson testified that McCord had a mood disorder but that he could not ascertain how severe it was from Dr. Bupp's notes, and thus could not make a mental RFC finding without sufficient notes. (AR 74). This is not inconsistent with Dr. Bupp's diagnosis of depression. Finally, Dr. Alpern testified primarily about McCord's physical impairments, but noted that in his opinion, McCord's fatigue was related to depression, not mold poisoning. (AR 83). Again, this opinion is not inconsistent with Dr. Bupp's opinion that McCord was depressed.

The undersigned also notes that in summarily dismissing Dr. Bupp's opinion, the ALJ also failed to acknowledge Dr. Bupp's OCD diagnosis. While Defendant contends that McCord never claimed she was disabled based on OCD and never alleged her OCD was a severe impairment,[8] "[t]he ALJ is required to consider all of the limitations imposed by the claimant's impairments, even those that are not severe." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008) (*citing* SSR 96–8p (1996). "Even though a non-severe 'impairment[ ] standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a

---

[8] The Commissioner also erroneously states that Dr. Bupp characterized McCord's OCD as "mild," when at various times Dr. Bupp assessed her OCD as "mild" and "moderate."

claim.'" *Id.*; s*ee also* 42 U.S.C. § 423(d)(2)(B) ("In determining whether an individual's . . . impairments are of a sufficient medical severity that such . . . impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."). Thus, the ALJ erred in failing to consider Dr. Bupp's OCD diagnosis.

McCord also argues that the ALJ failed to evaluate Dr. Bupp's opinion as a physician who assessed McCord's physical and mental impairments. The Commissioner counters that Dr. Bupp never treated McCord for mold poisoning and that the ME testified that mold poisoning is not an acceptable diagnosis. However, McCord notes that "the ALJ herself agreed that McCord had environmental limitations due to a history of asthma." (Doc. 19 at 6). The parties' arguments on this point confuse the issues. Dr. Bupp did not treat McCord for mold poisoning, but rather indicated in his progress notes that she was being seen by Dr. Gray for this condition, and documented in his notes what McCord told him about the status of her condition. In his medical assessment, Dr. Bupp noted that "depression, OCD, [and] aspergillosis have [a] combined effect on [McCord's] functional capacity." (AR 406). The medical assessment form indicated that Dr. Bupp was to evaluate McCord's psychiatric status; thus, Dr. Bupp's assessed limitations were presumably based on the psychiatric impact that McCord's various physical and mental impairments had on her. Accordingly, while part of Dr. Bupp's opinion included McCord's mold poisoning, which the ALJ found was not a medically determinable impairment, Dr. Bupp is McCord's treating psychiatrist, and his inclusion of aspergillosis in his comments on the medical assessment form is not a clear and convincing or a specific and legitimate reason for rejecting the entirety of Dr. Bupp's opinion as to McCord's mental limitations.

In sum, the ALJ's conclusory dismissal of Dr. Bupp's opinion as "too restrictive and not supported by the objective evidence" is wholly inadequate to meet the required standards of either clear and convincing reasons or specific and legitimate reasons

1   supported by substantial evidence. (AR 21). In addition, the ALJ failed to consider any of

2   the factors outlined in 20 C.F.R. 404.1527(c). Accordingly, the undersigned finds that the

3   ALJ erred in rejecting Dr. Bupp's opinion. Further, because the ALJ failed to provide

4   "legally sufficient reasons for rejecting" Dr. Gray's opinion, that opinion is credited as

5   true. *Benecke*, 379 F.3d at 593; *see also Lester*, 81 F.3d at 834. Because Dr. Bupp

6   identified restrictions that would preclude McCord from performing her past relevant

7   work or any work existing in the national economy, this error was harmful and remand

8   for an award of benefits is appropriate.[9]

9      B. Credibility Determination

10      McCord argues that the ALJ failed to give clear and convincing reasons for

11   rejecting her testimony regarding her symptoms and activities of daily living, and failed

12   to evaluate the lay witness statement of McCord's husband.

13      "An ALJ's assessment of symptom severity and claimant credibility is entitled to

14   great weight." *Honaker v. Colvin*, 2015 WL 262972, *3 (C.D. Cal. Jan. 21, 2015)

15   (internal quotations and citations omitted). This is because "an ALJ cannot be required to

16   believe every allegation of disabling pain, or else disability benefits would be available

17   for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Treicherler v.

18   Comm'r. Soc. Sec. Admin.*, 775 F.3d 1090, 1106 (9th Cir. 2014) (citation omitted). "If the

19   ALJ's credibility finding is supported by substantial evidence in the record, the reviewing

20   court may not engage in second-guessing." *Honaker*, 2015 WL 262972 at * 3 (internal

21   quotations and citation omitted).

22      While questions of credibility are functions solely for the ALJ, this Court "cannot

23   affirm such a determination unless it is supported by specific findings and reasoning."

24   *Robbins v. Comm'r Soc. Sec. Admin.* 466 F.3d 880, 885 (9th Cir. 2006). "To determine

25   ─────────────

26   [9] "[T]he district court should credit evidence that was rejected during the
administrative process and remand for an immediate award of benefits if (1) the ALJ
27   failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no
outstanding issues that must be resolved before a determination of disability can be made;
28   and (3) it is clear from the record that the ALJ would be required to find the claimant
disabled were such evidence credited." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir.
2004).

whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter*, 504 F.3d at 1035-36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id*. at 1036 (*quoting Bunnell v. Sullivan*, 947 F. 2d 341, 344 (9th Cir. 1991)). "Second, if the claimant meets this first test and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of the symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (*quoting Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Further, "[t]he ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).

While it is permissible for an ALJ to look to the objective medical evidence as one factor in determining credibility, the ALJ's adverse credibility finding must be supported by other permissible evidence in the record. *Bunnell*, 947 F.2d at 346–47 ("adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence"). However, "an ALJ may reject a claimant's statements about the severity of his symptoms and how they affect him if those statements are *inconsistent with or contradicted by* the objective medical evidence." *Robbins*, 466 F.3d at 887 (emphasis in original).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotations and citations omitted).

Here, the ALJ determined that McCord's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (AR 23). The ALJ did not

1    make a finding that McCord was malingering; therefore, to support her discounting of

2    McCord's assertions regarding the severity of her symptoms, the ALJ had to provide

3    clear and convincing, specific reasons.

4              1.  Claimant's Testimony

5          McCord argues that just because she engaged in some activities of daily living, it

6    does not mean that she was not credible or that she could perform work. The

7    Commissioner contends that the ALJ found inconsistencies between McCord's reported

8    symptoms and her demonstrated functioning,[10] and that the medical evidence did not

9    support the severity of McCord's alleged symptoms because there were minimal

10   objective findings and the majority of McCord's test results were normal.

11         In her August 22, 2013 opinion, the ALJ found that McCord's statement's

12   concerning the intensity, persistence and limiting effects of her symptoms were not

13   entirely credible in part because McCord received only "modest treatment for

14   gastrointestinal problems, right shoulder joint pain/stiffness, rhinitis, arthritis, asthma,

15   restless legs, and fatigue." (AR 23). The ALJ also noted that McCord's treatment had

16   generally been successful in controlling her symptoms. This is a permissible inference,

17   because "evidence of 'conservative treatment' is sufficient to discount a claimant's

18   testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 750–51

19   (9th Cir. 2007); *see also Benjamin v. Colvin*, 2014 WL 4437288, at *2 (C.D. Cal. Sept. 9,

20   2014) (collecting cases) ("a limited course of treatment sometimes can justify the

21   rejection of a claimant's testimony, at least where the testimony concerns physical

22   problems"). However, by focusing on the objective medical evidence, the ALJ

23   overlooked the lengthy and frequent course of medical treatment, the nature and extent of

24   that treatment, the numerous medications McCord was prescribed, and McCord's

25   persistent complaints of debilitating fatigue, joint pain, allergic reactions to her

26   ─────────────

27      [10] Defendant also contends that McCord did not challenge this part of the ALJ's
     credibility finding and therefore has waived argument on this point. However, in
28   McCord's opening brief she clearly argues that the ALJ erred in negatively assessing her
     credibility, and the Court will not require her to list every sentence of the ALJ's opinion
     that she objects to.

surroundings, depression, and nasal and sinus problems. *See Rogers*, 486 F.3d at 248. Consequently, given the nature of McCord's impairments, any lack of objective findings in proportion to the alleged severity of McCord's symptoms does not constitute clear and convincing evidence discounting McCord's subjective symptom testimony, and her "constant quest for medical treatment and pain relief refutes such a finding." *Vertigan*, 260 F.3d at 1050.

The ALJ also found that McCord's level of functioning was inconsistent with her alleged limitations because she was able to volunteer several times a month, take care of her husband and pets, keep the house tidy, read, play the violin, paint, cook, and walk for exercise. (AR 23). The ALJ stated that "[i]t can thus be inferred that the claimant has maintained a somewhat normal level of daily activity and interaction" and that "the physical and mental requirements of these household tasks and social interactions are consistent with a significant degree of overall functioning." "[The Ninth Circuit] has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). Here, McCord's daily activities, as she described them, do not contradict her other testimony. While McCord testified that she volunteers at a bookstore, she also stated that her ability to volunteer is limited by her state of illness, and that although she signs up for 3–4 shifts per month, she often has to cancel about half of the time. (AR 53, 56). Similarly, she volunteers at a nursing home 2–3 times per month for an hour, but noted that she makes her own schedule and goes when she feels well. (AR 52). While the ALJ stated McCord could take care of her husband and pets, McCord testified that she takes her dog out for a short walk when she feels good (AR 51), helps her husband obtain his medications, and prepares simple meals for him when she feels good (AR 54). Further, while the ALJ cited McCord's hobbies of reading, painting, playing the violin, and walking for exercise, McCord testified that does these activities when she is not sick, and that in a good week she might walk twice. (AR 55–

56).[11] Thus, none of the activities that McCord testified to are inconsistent with her testimony that she spends about 50 percent of her time sick, that she is very fatigued when sick, and that she naps once or twice per day for several hours, (AR 55–57),[12] and "[t]he record does not suggest that Plaintiff at any time reported that she performed activities which would translate to sustained activity in a work setting on a regular and continuing basis for eight hours a day, five days a week." *Benjamin*, 2014 WL 4437288 at *5.

The ALJ further noted that McCord "received only modest treatment for depressed mood." (AR 21). However, this conclusion ignores Dr. Bupp's treatment notes documenting McCord's long-term struggle with mental health issues, and his observations that McCord continued to experience symptoms of depression and OCD even while taking medication.[13] There is also no evidence in the record that McCord was advised to seek counseling or other treatment in addition to her medication management appointments. *See e.g., Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (citations and quotations omitted) ("it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."); *see also Rosas*

---

[11] *See Vertigan*, 260 F.3d at 1049 (certain activities such as limited walking "are not necessarily transferrable to the work setting with regard to the impact of pain. A patient may do these activities *despite* pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or engage in similar activity for a longer period given the pain involved.") (emphasis in original).

[12] McCord also argues that the ALJ failed to identify any activity that she performed that showed evidence of work-related abilities. However, as Defendant notes, the ALJ was not required to make such a finding. "There are two grounds for using daily activities to form the basis of an adverse credibility rating. The first is when the activities contradict prior testimony. The second is when the activities meet a threshold for transferable work skills." *Strutz v. Colvin*, 2015 WL 4727459, at *5 (D. Or. Aug. 10, 2015) (*citing Orn*, 495 F.3d at 629). Here, the ALJ found that McCord's level of functioning was inconsistent with her testimony regarding her alleged limitations, not that her daily activities were transferrable to a work setting.

[13] *See e.g.* AR 351 noting McCord's affect was obsessive compulsive; AR 351 affect was anxious; AR 350 mood was depressed and affect was bland and labored; AR 349 affect was obsessive compulsive; AR 348 affect was anxious; AR 478 affect anxious and OCD symptoms persisted; AR 477 affect anxious and "OC worry process—yes:" AR 598 affect anxious; AR 596 affect anxious; AR 597 affect weary; AR 595 affect anxious and "OC process—yes."

*v. Colvin*, 2014 WL 3736531, at *11 (C.D.Cal. July 28, 2014) (claimant's limited treatment for mental illness not by itself a clear and convincing reason for rejecting claimant's credibility). In addition, "[t]hat a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001).

In her August 23, 2011 opinion, the ALJ found that while McCord "testified that she had problems with memory and focus, she was able to recall with precision and speed almost all of her numerous medications." (AR 120). The ALJ also noted that McCord "was able to recall dates . . . and did not appear to be forgetful or unable to concentrate." *Id*. "The ALJ's observations of a claimant's functioning may not form the sole basis for discrediting a person's testimony. Instead, an ALJ's personal observations may be used only in 'the overall evaluation of the credibility of the individual's statements.'" *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (*quoting* S.S.R. 96–7p at 8). "Because the ALJ's other reasons for rejecting [McCord's] testimony fail, the ALJ's personal observations standing alone cannot support the adverse credibility finding." *Id.* at 639–40.

In sum, the Court finds that the ALJ erred in discrediting McCord's subjective symptom testimony based on her allegedly modest treatment and her reports of daily activities. The undersigned further finds that these errors are harmful and negate the validity of the ALJ's ultimate nondisability determination because the ALJ's adverse credibility finding affected the limitations that the ALJ assessed in the RFC finding and the corresponding hypothetical presented to the VE, which in turn could alter the outcome of the case. *See Batson*, 359 F.3d at 1197.

## 2.  Lay Testimony

McCord alleges that the ALJ failed to evaluate the lay witness statement of her husband. The Commissioner contends that McCord's husband's testimony mirrored McCord's own testimony, and that the ALJ validly rejected all of the limits described by

McCord's husband when she discussed and assessed McCord's testimony.

"[L]ay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations omitted) (emphasis omitted). Thus, "[i]f the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). However, "if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012) (*citing Valentine*, 574 F.3d at 694).

Here, the ALJ failed to even mention the lay witness statement by McCord's husband. Thus, "under our rule that lay witness testimony 'cannot be disregarded without comment,' the ALJ erred in failing to explain her reasons for disregarding the lay witness testimony." *Molina*, 674 F.3d at 1115 (*citing Nguyen*, 100 F.3d at 1467). The Court must then consider whether this error was harmful.

In *Stout*, the court held that "where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006). In *Molina*, the court expanded on *Stout* and found that "an ALJ's failure to comment upon lay witness testimony is harmless where 'the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's] claims." *Molina*, 674 F.3d at 1122 (*quoting Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011)). In that case, the court noted that although the ALJ failed to explain her reasons for rejecting the lay witness testimony, the lay testimony did not describe any limitations beyond those that the claimant described, and that the ALJ rejected the claimant's testimony "based on well-supported, clear and convincing reasons." *Id.* The *Molina* court thus concluded that

"[b]ecause the ALJ had validly rejected all the limitations described by the lay witnesses in discussing Molina's testimony, we are confident that the ALJ's failure to give specific witness-by-witness reasons for rejecting the lay testimony did not alter the ultimate nondisability determination." *Id*.

In the present case, the undersigned finds that the ALJ did not provide clear and convincing reasons for rejecting McCord's testimony based on her activities of daily living or her "modest" physical and mental health treatment. Thus, even though the lay witness testimony describes essentially the same limitations that McCord testified to, because the ALJ did not provide legally sufficient reasons for discounting McCord's testimony, the undersigned cannot conclude that the ALJ's failure to even acknowledge the lay testimony was harmless. Further, the undersigned cannot find that this error was not prejudicial to McCord, because had the ALJ credited this testimony, it could have affected the RFC finding and the ultimate disability determination. *See Stout*, 454 F.3d at 1056. Accordingly, the undersigned concludes that the ALJ erred in disregarding the lay witness testimony and failing to explain her reasons for doing so, and that this error was harmful.

## V.   Remedy

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690.

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir.1989) (*quoting Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke*, 379 F.3d at 593. Conversely, remand for an award of

benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id*. (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id*. (citations omitted); *see also Lester*, 81 F.3d at 834.

As discussed above, the undersigned finds that the ALJ erred in failing to provide legally sufficient reasons for rejecting Dr. Bupp's opinion, for negatively assessing McCord's credibility, and for failing to address the lay witness testimony. The undersigned further finds that remand for an award of benefits is appropriate because Dr. Bupp's opinion regarding work restrictions which would render McCord disabled under the Act establishes that there are no outstanding issues that must be resolved before a determination of McCord's disability can be made because it is clear from the testimony of the VEs that the ALJ would be required to find McCord disabled were such evidence credited.[14]

Furthermore, it has been almost 7 years since McCord applied for benefits. The Ninth Circuit has recognized that "[r]emanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to 'tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand.'" *Benecke*, 379 F.3d at 595 (*quoting Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988)). Thus, because the ALJ failed to provide legally sufficient reasons for rejecting Dr. Bupp's opinion and negatively assessing McCord's credibility, and because all three

---

[14] Both VEs testified that, when the hypotheticals included Dr. Bupp's restrictions, McCord would be unable to perform any work existing in the national economy. (AR 60–61, 99).

factors favoring remand for an award of benefits are satisfied, remanding for further administrative proceedings "would serve no useful purpose and would unnecessarily extend [McCord's] long wait for benefits." *Benecke*, 379 F.3d at 595; *see also Regennitter v. Commissioner*, 166 F.3d 1294, 1300 (9th Cir. 1999) (where the court "conclude[s] that ... a doctor's opinion should have been credited and, if credited, would have led to a finding of eligibility, we may order the payment of benefits.").

**VI.   Recommendation**

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review, remand this matter for an award of benefits.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within fourteen days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Fed.R.Civ.P. 72(b). No reply to any response shall be filed. *See id*. If objections are not timely filed, then the parties' rights to de novo review by the District Court may be deemed waived. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 12th day of February, 2016.

Eric J. Markovich
United States Magistrate Judge